IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF JOE C. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF JOE C. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

ELVIRA C., APPELLANT

Filed December 31, 2018.    No. A-18-507.

Appeal from the Separate Juvenile Court of Douglas County: MATTHEW R. KAHLER, Judge. Affirmed.

Anne E. Troia, P.C., L.L.O., for appellant.

Donald W. Kleine, Douglas County Attorney, and Elizabeth McClelland for appellee.

Shannon Benash, guardian ad litem.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

Elvira C. appeals from the decision of the separate juvenile court of Douglas County terminating her parental rights to her three children, Joe C., Rebecca C., and Jonathan C. We affirm.

## BACKGROUND

### PROCEDURAL BACKGROUND

Elvira is the biological mother of Joe (born in 2006), Rebecca (born in 2007), and Jonathan (born in 2008). The State also filed a motion to terminate the parental rights of the children's father

during these proceedings, and the father voluntarily relinquished his parental rights to the children during the course of the termination of parental rights hearing. Because the children's father is not part of this appeal, he will only be discussed as necessary.

On May 9, 2016, the family home was raided by the Omaha Police Department and methamphetamine was found in the home; the children's father was arrested. Elvira and the children were evicted from the home and went to live at the Open Door Mission. Elvira later tested positive for methamphetamine.

On May 19, 2016, the State filed a petition alleging that Joe, Rebecca, and Jonathan were children within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Supp. 2015) due to the faults or habits of Elvira. That same day, the State filed an ex parte motion for immediate custody and pickup, which was granted by the juvenile court. The juvenile court granted the Nebraska Department of Health and Human Services (DHHS) temporary custody of the children for placement in foster care or other appropriate placement, to exclude the parental home; the children have been in foster care ever since.

On May 25, 2016, the children were adjudicated to be within the meaning of § 43-247(3)(a) based on Elvira's no contest plea to the allegation in the petition that her use of alcohol and/or controlled substances placed the children at risk of harm. (We note that although the May 25 order states that Elvira entered a no contest plea to the allegation, the bill of exceptions from the hearing shows that she admitted to the allegation.) In the disposition portion of the order, Elvira was ordered to: undergo a co-occurring evaluation; not possess or ingest alcohol and/or controlled substances unless prescribed by a licensed, practicing physician; undergo random, frequent, observed drug testing; participate in Alcoholics Anonymous/Narcotics Anonymous (AA/NA), obtain and maintain a sponsor with a minimum of 5 years of sobriety, and provide proof of attendance to DHHS; and be provided with housing and transportation assistance via DHHS and/or Nebraska Families Collaborative (NFC). It was also ordered that "an application shall be made for [Elvira] to Better Together," and Elvira was to have reasonable rights of family time/visitation as arranged by DHHS. Elvira was ordered to notify the Court, all counsel in the matter, and DHHS of any change of address and phone number within 48 hours of the change.

After a continued disposition hearing on August 9, 2016, the juvenile court ordered that Elvira be provided with supervised family time/visitation with her children. In addition to orders previously given, Elvira was ordered to: participate fully in intensive outpatient treatment as recommended by the substance abuse evaluation; take all medications as prescribed; continue to cooperate fully with psychiatric consults; continue to work with family support services; obtain and maintain a legal source of income and safe and adequate housing; work with a parenting coach to learn age appropriate parental responses to the ages and states of development of the children and appropriate disciplinary techniques; and not discuss the particulars of this case with her children.

After a continued disposition hearing on February 2, 2017, the juvenile court also ordered Elvira to: participate fully in and successfully complete the recommended level of substance abuse treatment; develop a relapse prevention plan with her therapist; write a letter to herself about the type of mother her children need and deserve and how she is going to ensure that she is that mother; sign a release for her substance abuse evaluation; successfully complete the Lydia House program; and be provided with relinquishment counseling.

After a review and permanency planning hearing on May 11, 2017, the juvenile court stated that it would provide "an additional ninety days for [Elvira] . . . to participate in rehabilitative services in order to correct the issues that were adjudicated." In addition to orders previously given, Elvira was ordered to participate in a smoking cessation program and to participate in marriage therapy and family counseling, if the children wished to participate. After a hearing on August 10, the juvenile court also ordered Elvira to participate in alternative dispute resolution of the permanency issue (to determine whether the case was ready for trial regarding termination of parental rights and to provide an opportunity to explore non-trial alternatives).

On November 20, 2017, the State filed a motion to terminate Elvira's parental rights to the children pursuant to Neb. Rev. Stat. § 43-292(2), (6), and (7) (Reissue 2016). The State alleged that: Elvira substantially and continuously or repeatedly neglected and refused to give the children, or a sibling, necessary care and protection; reasonable efforts to preserve and reunify the family had failed to correct the conditions leading to the previous adjudication of the children; the children had been in an out-of-home placement for 15 or more of the most recent 22 months; and termination was in the children's best interests.

After a review and permanency planning hearing on February 6, 2018, the juvenile court again ordered Elvira to submit immediately to random, observed drug testing; participate in fully supervised visits; and complete relinquishment counseling. The court noted the termination of parental rights hearing was set for March.

TERMINATION HEARING

The hearing on the motion for termination of Elvira's parental rights to the children was held over 3 days in March 2018. A summary of the relevant evidence follows.

Various court reports authored by family permanency specialists (FPS) involved in the case were received into evidence. According to those reports, Elvira was involved with Child Protective Services in California because during the delivery of her fifth child in 2002 she admitted to using methamphetamines 2 days prior to giving birth; her home was also found to be infested with flies, had no food, and the children had been without medical care; Elvira's parental rights to those five children were terminated in 2004. Additionally, there were "agency substantiated" intakes in 2006, 2007, and 2009 which included allegations of methamphetamine possession charges, Elvira's unsuccessful discharge from drug court, parental incarceration, and the home not having utilities. And in the instant case, the children were removed from Elvira in May 2016.

Olivia Lafollette is a FPS with PromiseShip, formerly known as NFC. She was the children's caseworker from May 2016 to April 2017, and became their caseworker again in January 2018, and was still their caseworker at the time of the termination hearing in March. Each time Lafollette was assigned the case, she reviewed the case file to familiarize herself with the facts, court orders, and services with which Elvira should have been participating.

Lafollette's understanding was that in May 2016, the family home was raided by the Omaha Police Department and methamphetamine was found in the home; the children's father was arrested. Elvira and the children were evicted from the home and went to live at the Lydia House (the court reports state they went to live at the Open Door Mission); Elvira tested positive for "meth" and was "kicked out" of the Lydia House and the children were removed at that time by the DHHS' initial assessment worker. The children have not been returned to the home of either

parent; they have been out-of-home for 22 months. Two of the services PromiseShip provided to Elvira from May 2016 until the time of the termination hearing in March 2018 were visitation and drug testing.

Lafollette testified that visits are supposed to occur when the initial assessment worker removes the children; in this case, the children were removed on May 19, 2016. However, visits had not been occurring because the initial assessment worker had not been able to get ahold of Elvira. When Lafollette became the caseworker around May 23, a visitation agency was not available. Lafollette met with Elvira at the first court date, talked about visits, and they were set up to start with CEDARS in June. Lafollette had concerns after looking over the visitation notes from CEDARS because "[d]uring one of the visits, [Elvira] had hit one of the children and the hotline was called and the visit was ended." "And there were other visits where [Elvira] would bring . . . friends or significant others into the visits when she was instructed not to." Elvira was discharged from CEDARS in August. There was a gap in visitation between August and December because Elvira "had been unsuccessfully discharged from visits, and we could not get ahold of her during that time to set up visits between her and her children"; Lafollette said, "I would try to call her, and she would not call me back." This gap in visits with the children from August to December was also noted in a court report, which indicated that Elvira was unsuccessfully discharged from "Cedars Kids" after "she stopped showing up for visits and had no interest in wanting to see her children during this time."

Lafollette further testified that in May 2016 Elvira was ordered to complete a chemical dependency evaluation. According to Lafollette, "[Elvira] completed different evaluations, and they recommended different levels" of treatment. The first evaluation was done at Bailey's Counseling in July 2016 and recommenced Level 1 outpatient treatment, which Elvira did not complete. On cross-examination Lafollette testified that Elvira was not allowed to complete the treatment because NFC did not feel it was the appropriate level of treatment due to things that she had reported in her evaluation (Lafollette did not believe Elvira was being completely honest about her drug use, and how often she was using, as she had missed drug tests), so Lafollette asked for a new evaluation to be completed. The second evaluation was done by Schrum Associates in October and recommended short-term residential treatment. Elvira went to the Lydia House residential treatment program in October. She was doing "very well" at Lydia House and her drug tests there were negative, otherwise she would have been "kicked out"; Owens & Associates was also drug testing Elvira during that time because Lydia House could not release their drug testing results.

In December 2016, while Elvira was residing at the Lydia House, Owens & Associates was arranging visitation. According to a court report, Owens & Associates reported no concerns with Elvira's parenting skills, but they did have to redirect her from talking about the case. Elvira regularly attended visits while living at the Lydia House from December 2016 to March 2017. In March 2017, NFC discussed moving the children into the Lydia House with Elvira, however that did not happen because Elvira was asked to leave the Lydia House in April after she was caught smoking cigarettes and not picking up after herself, which violated Lydia House's rules. Lafollette's only concern about visitation during this time was the inconsistency of the visits and that Elvira had trouble managing the children's behaviors and she needed "prompts to find different activities for the kids besides sitting on computers." Lafollette said that she discussed the

concerns with Elvira, talked about what activities she could do, and they started doing a parent coaching class with her during visits.

In mid-April 2017, Elvira entered into residential treatment at the Stephen Center, where she had daily classes, individual therapy, group therapy, drug tests, and attended 12-step meetings which are like AA/NA meetings. Elvira also began having visits again in April at the Stephen Center (she had missed some visits after leaving the Lydia House). Elvira ended visits early for various reasons, such as needing to go to church or to return to her treatment program. Elvira was also still making age inappropriate remarks about her relationship with the children's father. According to a court report, Elvira's visits were reduced from three times per week to twice a week in May because of Joe's and Jonathan's behaviors at school and the foster home after visits. In May, Elvira completed four out of seven scheduled visits. In June, visits were further reduced to once a week because Elvira was not confirming visits. She completed all four scheduled visits in June. Elvira was placed on an "as-needed" visitation schedule with Owens & Associates after failing to confirm her visits on September 5, 12, and 19. Elvira would need to call at least 24 hours in advance to request visits. She completed one visit in October. But no visits were reported by Owens & Associates in November or December. Elvira completed treatment at the Stephen Center in December, and she reported making several attempts to reach Owens & Associates to arrange visitation but said they never returned her call. According to Lafollette, after Elvira was successfully discharged from treatment at the Stephen Center in December, Elvira tried to have visits with the children and reached out to Owens & Associates almost every day to see if there was a worker available for visits; however, she only got a visit if a worker was available. The same thing happened in January 2018.

Elvira was discharged from Owens & Associates in February 2018. Elvira began working with a new visitation agency, Release Ministries, that same month; Lafollette had not fully received all of the reports but "[had not] had anything concerning come up yet." At the time of the termination hearing in March, Elvira had fully supervised visits which occurred every other week if she confirmed her visits; visits were not more frequent because "there's been a pattern throughout the lifetime of this case that [Elvira] has been inconsistent with visitation." It was concerning to Lafollette that at this point in the case Elvira was at this level and frequency of visitation because "usually within six to nine months of a lifetime of a case, we expect to see a parent having unsupervised, moving towards overnight visits."

Hillary Kalinzng is a supervisor at Owens & Associates. Kalinzng testified that Owens & Associates provided parenting time services to Elvira from November 2016 to February 2018. Elvira was discharged from Owens & Associates on February 12 because the agency had not been able to provide a visit for a while because it did not have any visitation workers available on the days that Elvira needed. According to Kalinzng, and a document she created (exhibit 36), Elvira attended 57 visits, had 12 cancellations, and 3 "no shows." There were an additional five cancellations that were not Elvira's fault. Kalinzng testified that there were concerns during Elvira's visits, mainly that the children were misbehaving and Elvira was not able to redirect them in a way that was helpful to resolving the situation; this was an ongoing problem.

Kalinzng stated that from November 2016 to May 2017 Elvira was scheduled to have fully supervised visits two times each week, and each visit was usually 2 hours long. In May visits were decreased to once per week because Elvira missed visits on May 2, 9, and 16. Kalinzng stated,

"Typically, if there's three visits missed in a row, or say three Sundays missed in a row -- which I believe those were all Sundays -- then we decrease." So, Elvira's visits were reduced due to her lack of participation, not showing up to visits, or canceling visits. Elvira "was at one visit a week until September 21" when she was moved to an "as-needed basis, due to, again, missing visits." Kalinzng said that an "as needed basis" "means that Elvira can call in once a week to request a visit," and "[i]f we have a visitation worker available and if the kids are available, we provide that visit." Elvira "hadn't called in for quite some time." "[S]he called to do a visit on the 20th of October, and I hadn't heard from her until, I believe, the very end of December," right before the holidays.

On cross-examination Kalinzng denied that Elvira called her on a daily basis during December 2017. When asked how often Elvira called her during the month of December, Kalinzng responded, "Some weeks she would call me two to three times. Other weeks, I might not hear from her. Most weeks, though, I did." According to Kalinzng, no visits were provided to Elvira in December. During the first half of December, Kalinzng had not heard from Elvira. Later in the month, the only days workers were available to do visits were on Tuesdays and Thursdays when the children's father already had visits. Additionally, several workers refused to supervise these visits "so that limited our pool of workers to choose from." When asked to explain why workers were not willing to work with the family, Kalinzng stated, "We had a lot of behaviors during visits, and one of the last incidents [in August 2017] took place in a car. It was very unsafe." Following a visit with Elvira, "[t]he oldest child became very . . . uncontrollable in the car. He was hitting things, yelling, hitting his siblings."

According to Kalinzng, in January 2018, Elvira called for visits fewer times, "It seemed like there were weeks, again, where she would call me multiple times and then other weeks where I wouldn't hear from her." Kalinzng testified that only one visit was provided to Elvira in January. During one of the weeks in January, Owens & Associates was unable to contact the foster parents, and it took "at least a week" for the FPS to respond to Kalinzng and provide a new number for the foster parent. Kalinzng had also contacted the FPS' supervisor when she was not getting a response, and it took the supervisor "close to a week" to get back to Kalinzng; this was concerning to Kalinzng because "[i]t was creating a barrier for Elvira to have her visits." Kalinzng agreed that for a period of time the lack of visits was not Elvira's fault.

With regard to Elvira's progress in her drug treatment, as previously noted, Elvira did complete her treatment at the Stephen Center in December 2017. However, Lafollette had concerns about whether Elvira internalized the treatment because shortly after Elvira graduated from residential treatment at the Stephen Center she tested positive for methamphetamine. Since Lafollette was reassigned to this case in January 2018, there have not been any concerns about Elvira's drug tests. Lafollette said, "It's only been a few weeks, and I believe she's made all of them."

The various court reports show the following regarding Elvira's drug use. In October 2016, Elvira was unsuccessfully discharged from drug testing services though Owens & Associates because she completed only 2 of 17 tests in September and October; she tested positive for alcohol on those two tests. It was reported by different people that she was purchasing urine to cheat on the drug tests. It was also reported in October by the children's father and Elvira's probation officer, that Elvira was still using methamphetamine. Elvira agreed to begin drug testing again in

December, but she only completed 1 of 13 tests offered by Owens & Associates; it was negative for drugs and alcohol.

In January 2017, Elvira reported being sober for 3 weeks; she was in inpatient treatment at the Lydia House and undergoing drug testing there, but it was not random. The Lydia House recommended that Elvira continue to drug test through Owens & Associates so that Lafollette could be provided with the lab results. From February 1 to April 11, Elvira completed 10 of 14 drug tests offered by Owens & Associates. At a team meeting on April 19, Elvira admitted to using methamphetamine after being kicked out of the Lydia House and before entering treatment at the Stephen Center; when she entered the Stephen Center, she had a positive drug test for methamphetamine. In May, Elvira completed two out of four drug screens; both results were negative. In June, she completed one out of four drug screens; her one test was negative. In July, Elvira completed two out of four drug screens with Owens & Associates; both tested negative. Elvira was reported to have tested positive for methamphetamine on July 31. Elvira did not complete any of her three drug screens in August. In September, Elvira completed two out of three drug screens; both tested negative. She did not complete any of her three drug screens in October, and on October 25 she was discharged by Owens & Associates for lack of participation. In December, Elvira completed 5 out of 14 drug screenings; she tested positive for methamphetamines on December 13, but her other four tests were negative.

Sarah Valentine is a supervisor of the drug testing department of Owens & Associates. She testified that Elvira was referred to Owens & Associates for drug testing in June 2016 and was still a client at the time of the termination hearing. Elvira successfully completed 63 tests; she was requested to test, but did not test, 88 times. Elvira was discharged from services on November 2, 2016, but was re-referred at the beginning of December, and she was required to call in at that time. She was discharged again on October 25, 2017, after a month or more of not successfully calling in. Olson & Associates took Elvira back in December, and they called her daily.

Lafollette testified that Elvira had utilized services offered by DHHS and PromiseShip, e.g. visitation, family support (began in June 2016, but unsuccessful discharge after 2 or 3 months), drug testing (but not consistently), bus tickets, a family group conference in August 2017, and relinquishment counseling. However, Elvira still had not completed many court orders; she did not have housing, her visits were inconsistent, and she did not provide proof of attending AA (except while at the Stephen Center). The week before the termination hearing commenced, Elvira told Lafollette that she had just started staying at a hotel. Elvira also reported being on "SSI."

Lafollette believed it was in the children's best interests to terminate Elvira's parental rights. The basis of her opinion was the length of time that the children had been in care, the lack of progress towards reunification, and Elvira's lack of learning something from treatment.

Stacey Sothman, a FPS supervisor with PromiseShip, testified that she became the supervisor for this family on January 15, 2017. Court reports dated August 1, 2017 (exhibit 21) and January 30, 2018 (exhibit 29), prepared by a FPS worker and signed by Sothman as supervisor, were received into evidence over objection and have been discussed previously in this opinion (the rulings were not challenged on appeal). Sothman testified that it would be in the children's best interest for Elvira's parental rights to be terminated. Sothman's opinion was based on her review of the records, the "staffings" of the case with the two workers, the lack of progress of the case towards permanency, and the length of time that the children have been in out-of-home care. On

cross-examination, Sothman acknowledged that she had never met Elvira or the children, and agreed she was basing her opinion on reports.

In an order filed on April 19, 2018, the juvenile court terminated Elvira's parental rights to Joe, Rebecca, and Jonathan after finding that statutory grounds for termination existed pursuant to § 43-292(2), (6), and (7), and that termination of parental rights was in the children's best interests. (We note that a second termination of parental rights order was file-stamped on April 25, and appears to be identical to the order file-stamped on April 19, except for the date above the judge's signature; the order filed-stamped on April 19 was "[d]ated" on April 16, and the order file-stamped on April 25 was "[d]ated" on April 18. There is no explanation in the record for why there were two orders.) In a separate order filed on April 19, the juvenile court granted Elvira's motion to continue visitation during the pendency of any appeal of the order terminating her parental rights.

On May 21, 2018, Elvira filed her notice of appeal of the juvenile court's order (she identifies the April 25 order) terminating her parental rights. Her appeal is timely since it was filed within 30 days of either order (May 19 fell on a Saturday, making the filing on the following Monday timely as to the April 19 order).

## ASSIGNMENTS OF ERROR

Elvira assigns, consolidated, that the juvenile court erred in finding (1) statutory grounds exist to terminate her parental rights under § 43-292(2) and (6), and (2) termination of her parental rights was in the children's best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches a conclusion independently of the juvenile court's findings. *In re Interest of Isabel P. et al.*, 293 Neb. 62, 875 N.W.2d 848 (2016).

## ANALYSIS

### STATUTORY GROUNDS FOR TERMINATION

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Elvira's parental rights to the children, the juvenile court found that statutory grounds existed pursuant to § 43-292(2) (substantial and continuous or repeated neglect), § 43-292(6) (reasonable efforts failed to correct conditions leading to adjudication), and § 43-292(7) (children out-of-home for 15 or more months of most recent 22 months).

Elvira does not assign error to the juvenile court's finding that statutory grounds for termination existed pursuant to § 43-292(7), and the record reflects that termination on such grounds was proper. The children had been in an out-of-home placement continuously since May 19, 2016. At the time the motion for termination of parental rights was filed on November 20,

2017, the children had been in an out-of-home placement for 18 months. At the time the termination hearing commenced on March 14, 2018, the children had been in an out-of-home placement for 5 days short of 22 months. Our de novo review of the record clearly and convincingly shows that grounds for termination of Elvira's parental rights under § 43-292(7) were proven by sufficient evidence. We therefore need not consider Elvira's argument with respect to the propriety of the termination of her parental rights pursuant to § 43-292(2) and (6), since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the children. See *In re Interest of Elizabeth S., supra*. Thus, the next inquiry is whether termination of Elvira's parental rights is in the children's best interests.

BEST INTERESTS

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *Id*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id*. The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *In re Interest of Nicole M., supra*. Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id*. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id*.

Joe, Rebecca, and Jonathan were removed from Elvira's care and custody in May 2016 because of her drug use; and Elvira appears to have a history of drug issues dating back a number of years. Elvira was a drug testing client of Owens & Associates on-and-off from June 2016 to time of the termination hearing (having been discharged from services twice during that time, only to resume services later). Elvira successfully completed 63 tests, but did not test 88 times. From December 2016 to December 2017, Elvira went to two different treatment facilities, the Lydia House and the Stephen Center. She was kicked out of the Lydia house for smoking cigarettes and not picking up after herself, which violated Lydia House's rules. She reported using methamphetamine after leaving the Lydia House and before entering treatment at the Stephen Center. She tested positive for methamphetamine on July 31, 2017 (while at the Stephen Center), and again in December, less than one week after being successfully discharged from the Stephen Center. Thus, on our de novo review of the record, it appears that Elvira mostly avoids using drugs while in treatment, but then almost immediately relapses when she is not in treatment.

Elvira seems to have a good relationship with her children. However, she fails to consistently visit and chooses to end visits early. Over the course of this case, Elvira went from having three visits per week, to having two visits, to having one visit per week. The first reduction was the result of the boys' behaviors after visits, but the second reduction was the result Elvira's failure to confirm visits. Admittedly from the end of December 2017 to February 2018, Elvira was reaching out for visits, but Owen & Associates had trouble finding workers to supervise the visits. In February a new visitation agency took over, and Lafollette said nothing concerning had come up from those visits in the few weeks leading up to the time of the termination hearing in March. At the time of the termination hearing, Elvira had fully supervised visits which occurred every other week if she confirmed her visits; visits were not more frequent because "there's been a pattern throughout the lifetime of this case that [Elvira] has been inconsistent with visitation." And it was concerning to Lafollette that at this point in the case Elvira was at this level and frequency of visitation because "usually within six to nine months of a lifetime of a case, we expect to see a parent having unsupervised, moving towards overnight visits."

Both Lafollette and Sothman testified that it was in the children's best interests to terminate Elvira's parental rights. Elvira made little progress over the duration of this case. Although she had completed treatment at the Stephen Center, she tested positive less than 1 week after her release. She was not consistently completing drug testing, was not providing proof of AA/NA attendance, and did not have appropriate housing. Additionally, she was still having fully supervised visits with the children and only on an every-other-week basis. At the time of the termination hearing, the children had been in an out-of-home placement for just short of 22 months. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J., supra*. We find that the State has rebutted the presumption of parental fitness as to Elvira. We further find that there is clear and convincing evidence that it is in the children's best interests to terminate Elvira's parental rights.

## CONCLUSION

For the reasons stated above, we affirm the order of the juvenile court terminating Elvira's parental rights to Joe, Rebecca, and Jonathan.

AFFIRMED.